**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Carlos Arturo ARANGO, Simeon Rojas–Lopez and Sixto Mario Arango,
Defendants–Appellants.**

**Nos. 86–5635, 87–5538.**

United States Court of Appeals,
Eleventh Circuit.

Aug. 29, 1988.

Lawrence F. Ruggiero, New York City, for defendants-appellants.

Dexter W. Lehtinen, U.S. Atty., Thomas A.W. FitzGerald, Linda Collins Hertz and

David O. Leiwant, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before JOHNSON, Circuit Judge, HENDERSON *, Senior Circuit Judge, and PITTMAN **, Senior District Judge.

PITTMAN, Senior District Judge:

The defendants, Carlos Arturo Arango (Carlos), Simeon Rojas-Lopez (Simeon), and Sixto Mario Arango (Sixto), appeal their convictions on one count of conspiracy to manufacture cocaine[1], two counts of possession with intent to distribute cocaine[2], and one count of manufacturing cocaine.[3] The defendants have raised five issues on appeal. We affirm.

## I. STATEMENT OF FACTS

### A. The Trial

The evidence at trial would warrant the jury's finding the following facts:

Between March 14th and 16th, 1986, Metro-Dade police officers and various Drug Enforcement Administration (DEA) officers conducted a joint surveillance of a warehouse district in Miami, Florida, on the suspicion that one or more cocaine manufacturing laboratories might be in operation in that vicinity. The investigation was initially begun due to complaints about ether-type smells in that neighborhood.

The warehouses focused upon during this investigation were referred to throughout trial as Location 1 and Location 2. This court will refer to those warehouses in the same manner.

During the evening of March 15, 1986, surveillance agents observed Sixto and Carlos leaving Location 1 and driving to a nearby convenience market. Later that night, the agents observed Carlos, wearing a yellow construction helmet, leaving Location 1 in a white van with a Fraternal Order of Police sticker on it. In the early morning hours of March 16, 1986, the agents saw Carlos, Sixto, and Simeon depart Location 1 in a light blue automobile and travel to Location 2, where they dropped Carlos off, continuing towards downtown Miami.

Sixto and Simeon were stopped and arrested shortly thereafter. At the time of the arrests, the agents seized the keys Sixto was carrying and those in the ignition of the vehicle which Simeon was driving. The agents also seized the clothing which these defendants were wearing, along with some yellow construction helmets found in the car's back seat.

The agents noticed the smell of ether on both Sixto and Simeon at the time of their arrests. Both defendants' clothing tested positive for traces of cocaine. The keys obtained from Sixto fit all the main locks at both locations and those seized from Simeon fit some, but not all, locks at both locations.

In the meantime, at approximately 4:30 a.m., a search warrant was being executed at Location 1. This search turned up approximately six pounds of finished cocaine, and all of the precursor chemicals necessary for the manufacture of cocaine, as well as screens, drying stands, plastic gloves, etc.

During this same time frame, surveillance continued at Location 2. At some point after 7:00 a.m., Carlos was arrested there and gave his signed consent for the search of the warehouse known as Location 2. There is some dispute as to how Carlos' arrest was effected, which will be discussed infra.

The search of Location 2 uncovered approximately 45 pounds of finished cocaine, along with 13 pounds of cocaine base, al-

---

* See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Virgil Pittman, Senior U.S. District Judge for the Southern District of Alabama sitting by designation.

1. In violation of 21 U.S.C. § 846.

2. In violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

3. In violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

most all of the requisite precursor chemicals necessary for the manufacture of cocaine, and the various equipment as was found at Location 1. At the time of his arrest, keys were seized from his person, along with the clothing he was wearing, which tested positive for the presence of traces of cocaine.

After waiving his rights in writing, Carlos admitted that he had been solicited to come to Miami from Colombia a few months before by a man named Orlando to guard and clean cocaine laboratories. He had been sleeping on a mattress in the back of Location 2 and was being paid $1,000.00 per month for these services. He further stated that approximately 40 to 50 pounds of cocaine had been manufactured at Location 1 the night before.

Prior to the trial, a Motion to Suppress was filed on behalf of Carlos, grounded on the factual allegation that these "statements were involuntary and coerced at gunpoint." [R1:Tab 42] On June 16, 1986, the district court denied the motion, after conducting an evidentiary hearing, finding that the statements were not involuntary.

On June 19, 1986, all three defendants were found guilty on four counts of the five-count indictment filed against them.

## B. The Remand Hearing

Sometime after defendants' appeals brief was filed with this court on March 10, 1987, the government filed a Motion for Stay of Briefing Schedule and Motion to Remand. The government stated that it sought this relief because:

> Subsequent to the convictions and sentencing in this matter, information came to the attention of undersigned counsel which was within constructive knowledge of the government at the time of trial, which should have been subjected to *in camera* examination by the court to determine its character as *Brady/Giglio* material disclosable to the defendants. [SR1:Tab 85]

On April 1, 1987, the district judge who tried the case set the government's motion for a hearing on April 9, 1987. At that time, the Assistant U.S. Attorney who tried the case, Fitzgerald, gave a summation of the undisclosed evidence in the constructive possession of the government. Subsequent to AUSA Fitzgerald's proffer, he petitioned the trial court to hold further proceedings on the issue and certify the results to this court.

In defendants' response, counsel consented to the trial court's resolution of the *Brady* issue raised by the government's motion.

The trial court determined that the proper procedure was that of *United States v. Ellsworth*, 814 F.2d 613 (11th Cir.1987), and set the matter for an evidentiary hearing on May 13, 1987.

Defense counsel was instructed to submit his post-trial motions prior to the evidentiary hearing. As such, counsel filed a Motion for Vacatur of Defendants' Convictions; Dismissal of Indictment; New Trial; and Production of Documents.

After two days of testimony the district court took the matter under advisement, rendering its Memorandum Opinion and Order denying defendants' motion in its entirety. The defendants now appeal from this order as well.

The trial court's memorandum opinion was reported at 670 F.Supp. 1558 (S.D.Fla. 1987). This court finds the trial court's findings of fact to be without prejudicial error. The trial court found that:

## II. FINDINGS OF FACT

1. In the early morning hours after his arrest on March 16, 1986 at a cocaine manufacturing laboratory located at 7943 N.W. 64 Street, Miami, Florida, Defendant Carlos Arturo Arango was taken by Metro-Dade police officers and DEA agents to the parking area of the Villa Regina Apartments located on Brickell Avenue in Miami, Florida.

2. Carlos Arturo Arango pointed out a vehicle parked in the parking garage of the Villa Regina Apartments, claiming that said vehicle belonged to his boss.

3. The police believed that Carlos Arturo Arango's boss was the money man behind the cocaine manufacturing operation.

4. A check with the apartment security disclosed that the vehicle belonged to Apartment 706.

5. Apartment 706 was leased to defendant Sixto Mario Arango.

6. The police then proceeded to enter Apartment 706, without a warrant, using keys obtained either from Carlos Arturo Arango's brother, Sixto Mario Arango, at the time of Sixto's arrest the night before, or those seized from Carlos Arturo Arango at the time of his arrest.

7. Present at the time of this warrantless entry were DEA agents Kenneth B. Peterson, Anthony Marratta, and John Andrejko, and Metro-Dade County officers Gerry Stinson, Gail Shaver, and Judy Gable. Agents Peterson and Andrejko were apparently in charge of the entry.

8. A search of the apartment was conducted whereupon a plasticene bag containing approximately two ounces of white powder was discovered on a table in the living area.

9. The white powder was never field-tested to determine whether it was an illegal controlled substance.

10. Agent Peterson telephoned AUSA William Norris from the apartment for the purpose of inquiring as to whether a search warrant could be obtained for the apartment, at which time Agent Peterson was referred to the Duty AUSA, Richard Scruggs.

11. AUSA Richard Scruggs instructed Agent Peterson to completely vacate the apartment, leaving its contents untouched, and to meet him at his office to discuss whether a search warrant could be obtained.

12. The police then vacated the apartment, leaving agents posted at the apartment complex, while Agents Peterson and Andrejko proceeded to meet with AUSA Richard Scruggs.

13. AUSA Richard Scruggs informed the DEA agents that a search warrant could not be obtained because of a lack of probable cause and advised the agents not to prepare a report of the incident. AUSA Richard Scruggs testified that his reasoning for this instruction was that 'he did not want to tie the hands of the handling AUSA' as to how the matter should be handled. He did, however, advise the agents that he would apprise the handling AUSA of the incident.

14. AUSA Scruggs also testified that he did make notes of this meeting with Agents Peterson and Andrejko in his capacity as Duty AUSA, but that these notes could not now be located.

15. Apparently, this file passed through the hands of several United States Attorneys, until it finally landed in the lap of AUSA Thomas A.W. Fitzgerald, who eventually tried the case on behalf of the government. None of the handling United States Attorneys were personally made aware of the warrantless entry by AUSA Richard Scruggs.

16. A couple of weeks before trial, AUSA Fitzgerald became aware of the warrantless entry into Defendant Sixto Mario Arango's apartment during the course of his pre-trial interview of agents Angel G. Hernandez and Andrew Perez.

17. Without investigating further, AUSA Fitzgerald dismissed the incident as irrelevant to the trial of Defendants Carlos Arturo Arango, Sixto Mario Arango, and Simeon Rojas-Lopez, and as 'too remote in time' to the incidents charged in the indictment herein, even though the arrests of all three Defendants and the warrantless entry occurred within a six-hour period of time.

18. AUSA Fitzgerald testified that he was not at any time prior to trial made aware of the fact that a bag of white powder was observed at the subject apartment.

19. Either while the jury was deliberating or immediately after the trial of this case, DEA Agent Peterson convened a meeting at DEA (Group 4) headquarters, at which various DEA agents and Metro-Dade police officers were present.

20. During the course of this meeting, Agent Peterson admonished those present for leaking information to the United States Attorney's Office regard-

ing alleged wrongdoing at the Villa Regina Apartments.

21. Although AUSA Fitzgerald became more fully aware of the incident in question, including the presence of the plastic bag of white powder and other allegations, after the trial of this case, this matter was not brought to the Court's or defense counsel's attention until concern arose as to how it might impact on the pending appeal and after it became the subject of an internal investigation by the Justice Department in Washington, D.C.

670 F.Supp. at 1560–61.

■ The trial court had the opportunity to hear and observe the witnesses in making its credibility determinations. As such, this court will not disturb its findings of fact unless clearly erroneous. *United States v. Willis,* 525 F.2d 657, 659 (5th Cir.1976).

Additionally, during the remand proceedings, the defendants received information relating to surveillance of the defendants prior to March 16, 1986. This prior surveillance stemmed from a DEA undercover storefront operation which was selling various precursor chemicals used in the manufacture of controlled substances. The defendants contend that no material was disclosed by the government to appraise them of this separate undercover storefront operation. However, a statement signed by Metro-Dade Detective Gail Shaver dated April 4, 1986, was provided to the defense as *Jencks* material which specifically noted the existence of an undercover chemical sale operation. No evidence resulting from this surveillance was introduced at trial.

## II. DISCUSSION

### A. Ineffective Assistance of Counsel

The appellants initially claim that they were denied their constitutionally guaranteed right to effective assistance of counsel. The appellants allege that (1) counsel failed to challenge the warrantless arrest of Carlos in not filing a motion to suppress; (2) counsel erred in failing to challenge the validity of the search warrant for the warehouse known as Location 1; (3) counsel failed to object to the alleged improper admission of various keys into evidence, and (4) counsel failed to adequately prepare for trial, along with certain other allegations.

■ The court finds that this issue is improperly before it, as claims of ineffective assistance of counsel may not be considered on direct appeal. *United States v. Souder,* 782 F.2d 1534, 1539–40 (11th Cir. 1986). The question of ineffective assistance of counsel was not raised below and the trial court has not had the opportunity to consider evidence on this issue.

This claim is properly raised by collateral attack in the district court. "Such a contention must be made in a context in which a factual hearing may be conducted." *Id.* at 1539. After the issue is raised in the trial court, this court would be afforded an order and a record to review. *United States v. Griffin,* 699 F.2d 1102, 1109 (11th Cir.1983).

### B. Motion to Suppress

As previously noted, Carlos Arango filed a motion to suppress the use of any confessions or admissions against interest obtained by the agents involved in his arrest on grounds that the statements were involuntary and coerced at gunpoint. The district court judge held a hearing on Carlos' motion prior to trial, ruling that said motion was due to be denied.

The defendant now argues that the trial judge made a factual finding that was clearly erroneous, requiring suppression of his post arrest statements as well as all evidence subsequently seized from Location 2. The factual finding specifically at issue is:

As to findings of fact, on Sunday, March 16, 1986, at about 7:00 a.m., the defendant Carlos Arango was awakened from sleep within a mini-warehouse located in an industrial area at 7943 Northwest 64th Street, Miami, Florida. As he went to the front door, he heard noises and thereafter exited the premises, where he was seized by at least two police officers.

■ This court will not upset a district court's determination that a statement was voluntary unless clearly erroneous. *United States v. De Parias*, 805 F.2d 1447, 1456 (11th Cir.1986); *United States v. Beck*, 729 F.2d 1329, 1333 (11th Cir.1984), *cert. denied*, 469 U.S. 981, 105 S.Ct. 383, 83 L.Ed. 2d 318 (1984). "The applicable standard for determining whether a confession was voluntarily given is whether, under all of the surrounding circumstances, the statement was the product of the accused's 'free and rational' choice." *United States v. Vera*, 701 F.2d 1349, 1364 (11th Cir.1983), *citing Martinez v. Estelle*, 612 F.2d 173, 177 (5th Cir.1980).

The district court's finding that Carlos exited the warehouse of his own volition was but one of several factual findings leading to the ultimate conclusion that the defendant's statements were voluntary. The district court also found that when the defendant first exited the warehouse, officers had guns with them which could have been pointed in any number of directions, including at the defendant [R3:60], and Carlos was justifiably nervous due to the presence of the police officers. Detective Hernandez arrived approximately 15 minutes after Carlos exited the warehouse [R3:58]. Hernandez then verbally Mirandized the defendant in Spanish and took him back inside the warehouse.

Hernandez and his partner then went through each of the Miranda warnings in Spanish and in detail, whereupon the defendant acknowledged his understanding by initialing each question on the waiver of rights form, which later became Government's Exhibit 41 [R3:59].

The district court then concluded that:

These circumstances, in the view of the Court, do not create conditions which, taken in their totality, would cause a finding to be necessitated that the restraints and the circumstances in which this defendant found himself were adequate or sufficient to violate either his constitutional rights or any of the law established by *Jackson v. Denno* [378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)] and its progeny.

The defendant apparently was in the company of Officer Hernandez for about forty-five minutes, thirty to forty-five minutes from the time Hernandez first arrived on the scene until they left that back room in the rear of the warehouse. That is an apparent period of time that can be interpreted and applied as constituting a sufficient period of time for the defendant, a young man, to calm down.

\* \* \* \* \* \*

Now, taking all of the circumstances in their totality, I do not find that there has been established any force or threats or acts on the part of the Government agents that would necessitate the motion to suppress to be granted.

[R3:59–61]

■ The district court concluded that the time the defendant spent with Officer Hernandez was sufficient to calm him down from any excitement or apprehension induced by his initial arrest. *See United States v. Bayer*, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), *reh'g denied* 332 U.S. 785, 68 S.Ct. 29, 92 L.Ed. 368 (1947); *Leon v. Wainwright*, 734 F.2d 770, 772–73 (11th Cir.1984). The district court held that under the totality of the circumstances the defendant's statements were voluntary.

Based upon the foregoing discussion, we hold that the district court was not clearly erroneous in denying the defendant's motion to suppress.

**C. Sufficiency of the Evidence.**

Appellants Sixto and Simeon contend that there was insufficient evidence to support their convictions on either the conspiracy count or the substantive counts.[4]

Simeon contends that the evidence introduced against him demonstrates at most, that he was present for a while in the warehouse that particular evening. He ar-

---

**4.** Appellant Carlos Arango does not challenge the sufficiency of the evidence supporting his convictions.

gues that there was no evidence that he did anything while he was there; knew of anything illegal being done there; or that he had ever been there before. He claims that there was no evidence he joined into the conspiracy, even if he was aware of it, nor that he did anything to aid the substantive crimes. Therefore, he contends that pursuant to *United States v. Sullivan,* 763 F.2d 1215 (11th Cir.1985), the evidence failed to establish more than "mere presence" at the scene or "mere association with conspirators" and, as such, his conviction cannot stand.

Sixto contends that the evidence introduced against him at trial does no more than indicate that he visited his brother, Carlos, that evening and brought along a friend, Simeon. He argues, along with Simeon, that the evidence only established his "mere presence" on the scene and, therefore, his conviction should also be reversed.

This court must view the evidence in the light most favorable to the government, with all reasonable inferences drawn in favor of the jury's verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The applicable standard of review for sufficiency of the evidence has been stated as follows: "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir., Unit B, 1982) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). "Arguments setting forth a reasonable hypothesis of innocence are properly presented to the jury, but the existence of such a hypothesis no longer compels an acquittal." *United States v. Cruz–Valdez,* 773 F.2d 1541, 1545 (11th Cir.1985) (en banc), *cert. denied,* 479 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986).

 In order to convict a defendant or defendants of a drug conspiracy, the government must prove the existence of a conspiracy, that the defendants knew of it, and that, with knowledge, the defendants voluntarily became a part of the conspiracy. *United States v. Alvarez,* 755 F.2d 830, 853 (11th Cir.1985), *cert. denied,* 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985). The *Alvarez* court pointed out that "the government need not prove that a defendant had knowledge of all details or phases of the conspiracy. Rather, it is enough that the defendant knew the essential nature of the conspiracy." *Id.* at 853. Direct evidence of the elements of a conspiracy is not necessary. A defendant's knowing participation in the conspiracy may be established through proof of surrounding circumstances, such as acts committed by the defendant which furthered the purpose of the conspiracy. *United States v. Bain,* 736 F.2d 1480, 1485 (11th Cir.1984), *cert. denied,* 469 U.S. 937, 105 S.Ct. 340, 83 L.Ed.2d 275 (1984); *see also United States v. Garcia,* 721 F.2d 721, 725 (11th Cir.1983) ("A defendant's involvement as a conspirator may be shown through knowledge of the conspiracy and association with coconspirators combined with other circumstantial evidence").

As for the substantive count of possession, the government must prove beyond a reasonable doubt that Sixto and Simeon knowingly possessed the cocaine, either actually or constructively, and intended to distribute it. *United States v. Cruz-Valdez,* 773 F.2d at 1544, *citing United States v. Littrell,* 574 F.2d 828, 835 (5th Cir.1978). "Constructive possession consists of the knowing exercise of or the knowing power or right to exercise dominion and control over the substance [cites omitted]. Constructive possession need not be exclusive but may be shared by others." *United States v. Knight,* 705 F.2d 432, 433 (11th Cir.1983).

In the *Cruz–Valdez* case, *supra,* this court adopted this rule:

> The circumstances required to establish voluntary participation in the criminal acts that are afoot may vary. There is no set formula. A jury may find knowledgeable, voluntary participation from presence when the presence is such that

it would be unreasonable for anyone other than a knowledgeable participant to be present.

*Cruz-Valdez,* 773 F.2d at 1546.

Therefore, this court may examine all of the proven surrounding circumstances, including the defendants' presence in the warehouse, in determining whether a jury could infer and find beyond a reasonable doubt, knowing and intentional participation. *United States v. Gonzalez-Torres,* 779 F.2d 626, 627 (11th Cir.1986).

■ The evidence at trial shows that the defendants were on the premises of Location 1 on the evening of March 15, 1986, and did not leave until the early morning hours of March 16, 1986, shortly after which they were arrested. During that period of time, approximately 40 to 50 pounds of cocaine were processed at Location 1. [R4:85–86, 120, 133–34, 136–38, 158, 161; R6:392–94, 404]

The agents who arrested Sixto and Simeon testified that there was a strong smell of ether emanating from them at the time they were taken into custody and subsequent tests of their clothing indicated the presence of traces of cocaine. Furthermore, the agents seized Sixto's keys which, as previously noted, fit all the main locks at both processing locations, as well as the ignitions of both the blue car and the white van found at Location 2.

Simeon was driving the blue car at the time of their arrests. The agents seized the keys in the ignition and found that they fit some locks at both locations. The agents also found the yellow hardhats in the car which they had observed persons wearing during the course of their surveillance of Location 1.

The presence of Sixto and Simeon at Location 1 is undisputed. From the evidence presented, a jury found find beyond a reasonable doubt that they also participated in manufacturing the cocaine at Location 1. A jury could reasonably find that a cocaine manufacturer would not allow outsiders to be present while they processed 40 to 50 pounds of cocaine worth a great deal of money. It was reasonable to determine that these defendants were active participants. *See Cruz-Valdez,* 773 F.2d at 1546. *See also United States v. Miller,* 693 F.2d 1051 (11th Cir.1982); *United States v. Groce,* 682 F.2d 1359 (11th Cir.1982); *United States v. Julio-Diaz,* 678 F.2d 1031 (11th Cir.1982). It is highly unlikely that cocaine processors would allow outsiders to have keys, and thus access, to their processing laboratories, containing thousands of dollars in equipment, raw materials and finished product.

We think it reasonable for a jury to conclude that in the course of manufacturing and possessing hundreds of thousands of dollars worth of illegal drugs, utilizing procedures which lack the ordinary protections most businesses enjoy, a prudent cocaine manufacturer "is not likely to suffer the presence of unaffiliated bystanders." *Cruz-Valdez* at 1547.

### D. Brady/Giglio Implications

The defendants contend that the government's failure to disclose the illegal search of Sixto's apartment and the DEA storefront operation selling precursor chemicals has *Brady/Giglio* implications.

In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court set forth three criteria which must be established by a criminal defendant in order to prove a claimed violation of due process resulting from the prosecution's withholding of evidence. Specifically, "the defendant alleging a *Brady* violation must demonstrate (1) that the prosecution suppressed evidence, (2) that the evidence suppressed was favorable to the defendant or exculpatory, and (3) that the evidence suppressed was material." *United States v. Severdija,* 790 F.2d 1556, 1558 (11th Cir.1986).

Since it is clear the third requirement of *Brady* has not been met, it is not necessary to discuss requirements one and two. In *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court noted three situations which require a varying test for materiality: (1) situations where the government had not disclosed information despite a specific re-

quest from defense counsel; (2) cases where the government had not disclosed information despite a general request for all exculpatory information or without any request at all; and (3) those situations where the defendants' convictions are based on false evidence. This court has added a fourth situation in which the government fails to disclose purely impeaching evidence not concerning a substantive issue, where there was no specific request. *Garrison v. Maggio,* 540 F.2d 1271 (5th Cir.1976), *cert. denied* 431 U.S. 940, 97 S.Ct. 2655, 53 L.Ed.2d 258 (1977).

■ The only two categories into which this case could arguably fall are the second and the fourth. The Supreme Court held in *Agurs* that where there has been no specific defense request, a failure to disclose will violate due process "if the omitted evidence creates a reasonable doubt that did not otherwise exist." 427 U.S. at 112, 96 S.Ct. at 2402. The Court went on to explain that:

> This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Id.* at 112–13, 96 S.Ct. at 2402.

When there has been no specific defense request, or only a general request for evidence, "[T]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). The standard for materiality in the fourth situation has been stated as follows: "Suppressed evidence useful only for impeachment purposes is material if its disclosure probably would have resulted in acquittal." *United States v. Darwin,* 757 F.2d 1193, 1202 (11th Cir.1985), *cert. denied* 474 U.S. 1110, 106 S.Ct. 896, 88 L.Ed.2d 930 (1986).

This court holds that pretrial disclosure of the government's entry into Sixto's apartment without a warrant, with a reasonable degree of probability, would not have resulted in a different jury verdict as to any of the defendants.

As to the second category, Sixto is the only defendant who could have used the additional information because it was the warrantless entry into his apartment. Taking the record in its entirety this court is hard pressed to believe that had the jury known of this evidence it would have acquitted Sixto of the cocaine manufacturing, possession or conspiracy to manufacture charges.

As to the defendants' claim that the illegal entry could have been used for impeachment or credibility purposes, it must be pointed out that this is not a case where the government's entire case was based upon the testimony of one witness as in *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). In this case all of the evidence introduced against these defendants was corroborated by several other witnesses, several of whom were not involved in the warrantless entry. The evidence would not have been admissible to attack the general credibility of the government's witnesses who actually participated in the warrantless entry because extrinsic evidence is not admissible for the purpose of attacking credibility. Fed.R.Evid. 608(b); *United States v. DiMatteo,* 716 F.2d 1361, 1365–67 (11th Cir.1983), *vacated on other grounds,* 469 U.S. 1101, 105 S.Ct. 769, 83 L.Ed.2d 767, *on remand,* 759 F.2d 831 (11th Cir.1985), *cert. denied,* 474 U.S. 860, 106 S.Ct. 172, 88 L.Ed.2d 143 (1985).

### E. Government Misconduct

■ The last argument raised by the appellants is that considering the totality of the circumstances, the government's conduct—both that of the investigators as well as the government attorneys—was so outrageous as to shock the universal sense of justice and, as such, requires dismissal of the indictment. *United States v. Ofshe,*

817 F.2d 1508, 1516 (11th Cir.1987), *cert. denied* —— U.S. ——, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987).

In the *Ofshe* case, *supra*, this court was called upon to review a decision by the district court denying a motion to dismiss in a situation where the government had gone so far as to place a "body bug" on a defendant's attorney subsequently monitoring a conversation between the defendant and said attorney. Ofshe argued that the government's conduct in invading attorney-client communications was so outrageous as to violate his fifth amendment rights to due process thus requiring dismissal of the indictment. This court affirmed the district court holding that after considering the totality of the circumstances, the actions of the government were not so outrageous as to "shock the universal sense of justice." *Id.* at 1516.

This court set forth the standard for determining whether such conduct exists in *United States v. Haimowitz*, 725 F.2d 1561, 1577 (11th Cir.1984) *cert. denied*, 469 U.S. 1072, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984), *quoting United States v. Tobias*, 662 F.2d 381, 387 (5th Cir.1981), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982), as follows: "Whether outrageous governmental conduct exists 'turns upon the totality of the circumstances with no single factor controlling' and the defense 'can only be invoked in the rarest and most outrageous circumstances.' "

As such, we hold that the government's conduct in the case *sub judice* does not rise to the level set forth in *Haimowitz* and *Ofshe* so as to require dismissal of the indictment.

For the foregoing reasons, the district court is hereby AFFIRMED.